457 A.2d 861

**In re ESTATE OF Margaret C. AGOSTINI, Deceased.**

**Appeal of Maria Agostini LEPS and Marco Agostini, Exceptants.**

**In re ESTATE OF Margaret C. AGOSTINI, Deceased.**

**Appeal of Maria Agostini LEPS and Marco Agostini, Exceptants.**

Superior Court of Pennsylvania.

Argued Oct. 27, 1982.

Filed Jan. 28, 1983.

Reargument Denied April 8, 1983.

Petition for Allowance of Appeal Denied June 24, 1983.

234

James R. Beam, Norristown, for appellants.

Stephen M. Cushmore, Norristown, for participating parties.

Before HESTER, WICKERSHAM and POPOVICH, JJ.

POPOVICH, Judge:

This case involves consolidated appeals from the Orders of the Court of Common Pleas of Montgomery County, Orphans' Court Division, concerning the validity of the Will of Margaret C. Agostini, who died at the age of 82, and the proposed dispersement of estate assets (valued at approximately $140,000.00) in accordance therewith. We affirm.

Procedurally, we observe that initially the appellants, Maria Agostini Leps and Marco Agostini, sought to have the Will of the decedent invalidated. After the court en banc dismissed their exceptions to the trial court's Decree Nisi upholding the validity of the testamentary document, an appeal, docketed at No. 928 Philadelphia 1981, was filed with this Court. During the pendency of the aforementioned appeal, the executors-appellees, Louis Agostini and Helen Mickel, petitioned the trial court to issue an order directing a bank to release estate funds deposited with the institution. An order was so entered, exceptions thereto were dismissed by a court en banc and an appeal, docketed at No. 221 Philadelphia 1982, was filed with this Court. On March 9, 1982, this Court consolidated the two cases for argument and appeal purposes.

Since both appeals question the chancellor's findings of fact and conclusions of law, approved by a court en banc, the standard of review consists of the following:

"'[T]he findings of fact of the [c]hancellor who heard the testimony without a jury, approved by a court en banc,

are entitled to the weight of a jury's verdict; that such findings are controlling and that the court's decree should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence.' The chancellor's findings are especially binding where they are based upon the credibility of the witnesses." (Citations omitted) *Hankin v. Hankin*, 279 Pa.Super. 179, 196–197, 420 A.2d 1090, 1099 (1980).

The caveat to the preceding was reiterated most recently by this Court in the case of *In re Hanley Trust*, 307 Pa.Super. 153, 163, 452 A.2d 1360, 1365 (1982):

" ' "However, the chancellor's 'conclusions whether of law or ultimate fact are no more than his reasoning from the underlying facts and are reviewable', especially 'where the underlying facts themselves are not in esse but are matters of inference and deduction'. [Citing cases.] Furthermore, a chancellor's findings of fact, even though approved by a court en banc, need not be accepted as conclusive if there is no evidence to support them or if they are based on an inference erroneously taken [citing cases] or where the evidence, in order to prevail, must be clear, precise and indubitable or must meet some other prescribed standard [citing a case]." ' " (Citations omitted) *Id.*, 307 Pa.Superior at 163, 452 A.2d at 1365. *Accord McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 450 A.2d 991 (1982); *Easton Theatres, Inc. v. Wells Fargo Land and Mortgage Co.*, 265 Pa.Super. 334, 401 A.2d 1333 (1979).

Although both appeals deal with the same parties and subject matter (decedent's Will), for ease of discussion we shall treat each case in *seriatim*.

### Appeal at No. 928 Philadelphia 1981

The background and circumstances giving rise to this particular appeal, which appear in part in the Opinion of the court below, are as follows: In 1951, the appellants (Maria and Marco) were adopted by the decedent and her husband.

Maria lived with the decedent until 1967, thereafter she was married and moved to Oreland, Pennsylvania. Marco, in 1956 and at the age of 18, left home to join the army. Decedent, afflicted with diabetes, degenerative arthritis and gout, moved to Florida in 1971 after her husband died. During her stay in Florida, decedent was cared for by a niece, Ann Maestri. In 1978, decedent returned to this Commonwealth, stayed with Maria for four or five weeks and then moved into an apartment of her own. Shortly thereafter, decedent met with her attorney (Timothy Timoney) to arrange to change her Will—it is to be noted that while in Florida, decedent changed her Will seven times. In accordance with the wishes of the decedent, counsel drafted the testamentary document and had it executed on December 8, 1978. One reason for this latest revision was to "disinherit" Ann Maestri. Decedent felt that Ms. Maestri had not done enough for her to warrant what was provided for the niece in her Will.

On March 29, 1979, decedent sustained burns to her feet while attempting to use the bathtub. It was not until the next day, when the daughter came to visit and observed the injury, that a Dr. Borska was contacted. An examination revealed that the decedent had incurred first and second degree burns that ordinarily would have been considered fairly minor. However, since the decedent was a known diabetic suffering from arteriosclerotic cardio-vascular disease, the threat of infection was serious. Consequently, when the prescribed medications did not improve the decedent's condition, Dr. Borska admitted her to the hospital a week after the accident.

During the decedent's stay in the isolation unit, she remarked to an attending nurse that she was disenchanted with her daughter, Maria. This same nurse also testified that decedent, on occasion, would become perturbed and "yell" at Maria.

On April 12, the decedent was moved to a semi-private room and, for the first time, was visited by Rena McHugh (Rena), her niece. During the visit, decedent asked Rena to

contact her nephew, appellee-Louis Agostini (Louis), in Scranton, Pennsylvania regarding the transfer of her monies to a bank there. Louis was contacted by Rena and decedent sent him a letter dated May 4, 1979, wherein she wrote: "I want everything done properly because these two [—Maria and Marco—] are going to get a shock they won't forget." However, the transfer was never effectuated, apparently because a bank official told Louis that the plan was not feasible.

On May 15, decedent was advised that the injury she sustained would require amputation of a toe. Over the next few days, decedent requested that the surgery be postponed until she could speak with her attorney. In fact, at one point, she asked to be released so it could not be said later that her hospitalization was indicative of her incompetency in matters dealing with her property. Decedent's physician dispelled such notions by assuring her that she was fully alert, oriented and in possession of her faculties. This evaluation of decedent's competency was corroborated by the attending nurse from the isolation unit, to which decedent was transferred on May 18. According to the nurse, confusion on decedent's part did not manifest itself until May 29.

On the evening of May 18, decedent summoned Attorney Timoney and the two spoke for 1½ hours about changing her Will of December 8, 1978.[1] According to counsel, decedent's primary reason for the revision was to have Maria treated differently. Decedent recounted how she was dissatisfied with the manner in which Maria had cared for her after the accident; that an argument had ensued between the two in which Maria had said things that she would never forget.

Counsel, after reviewing the entire dispositive scheme, felt that the proposed distribution appeared to be an "overreaction" by the decedent to the recent turn of events. She

1. This Will provided a $30,000 bequest to Maria and named her residuary legatee. It also gave $5,000 to her husband and primarily favored Maria.

refuted this, contending instead that she had expended enough money on her adopted children and that she did not owe them anything. The next day the decedent sent a letter to counsel supplying a beneficiary's address.

On May 21, counsel presented decedent with the revised Will.[2] She read the document, paragraph by paragraph, and remarked that she was satisfied with the changes. When counsel again inquired if the instrument and the modifications contained therein were an "overreaction" on her part, decedent answered in the negative. Thus, the Will was executed and witnessed by counsel and a nurse. The following day, decedent had one of her toes removed. Although the attending physician noted in the hospital log that decedent was cheerful the day after the operation, the infection was not arrested and decedent's leg was amputated on May 30, 1979. Her mental condition deteriorated thereafter and she died on July 4.

On appeal, as well as in the proceedings below, appellants allege that the Will of May 21 should be ruled invalid either because: (a) it was the product of an insane delusion which affected testatrix's testamentary capacity; or (b) it was the product of undue influence exerted by Rena McHugh.

 We commence our discussion by observing that a Will should not be declared invalid except for compelling reasons. This is premised upon the concern of the law with protecting the testator and the legal objects of his bounty. " 'His property is his own, and he can dispose of it as he pleases, in life, and, after death, by means of his will.' " (Citation omitted) *In re Duncan's Will*, 147 Pa.Super. 133, 136, 23 A.2d 357, 358 (1941). Moreover, a testator with children can disinherit some or all of them for any reason whatsoever; he can give in his lifetime and also by Will all

2. This later Will favored Roy, Nicholas, David and Louis Agostini, and Rena McHugh, decedent's nephews and niece by marriage. This Will also reduced the bequest to Maria to $5,000, eliminated the bequest to her husband, increased bequests to the nephews and niece from $5,000 to $10,000 and substituted them as residuary legatees. Marco's bequest remained at $5,000, but $2,500 bequests to his children were deleted. There were certain other changes of less relevance.

of his property to the poor or to any charity he may desire, or he can give it to a friend, or he can prefer one child over all the others. Stated differently, a testator does not have to give any of his property to those he loves or to the relative society believes he should love, and he can give it in such a way that 99 percent of his fellow-citizens believe is foolish, unjust or outrageous. *In re Sommerville's Estate*, 406 Pa. 207, 225, 177 A.2d 496, 505 (1962). The preceding is in accordance with the established law of Pennsylvania that:

"... every individual may leave his property by [W]ill to any person, or to any charity, or for any lawful purpose he desires, unless he lacked mental capacity, or the [W]ill was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." *In re Johnson's Estate*, 370 Pa. 125, 127, 87 A.2d 188, 190 (1952).

Where a Will is drawn by decedent's lawyer and proved by him and the subscribing witnesses, as was the case here, the burden of proving testamentary incapacity[3] is upon the contestants, and "that burden can be sustained only by clear and strong or compelling evidence of lack of testamentary capacity or of undue influence ...." (Citation omitted) *In re Higbee's Will*, 365 Pa. 381, 382, 75 A.2d 599, 600 (1950); *see also In re Estate of Hastings*, 479 Pa. 122, 387 A.2d 865 (1978). Similarly, the burden of proving an insane delusion is on the person who asserts it. *In re Leedom's Estate*, 347 Pa. 180, 32 A.2d 3 (1943).

It would not be presumptuous to note that the formulation of a definition of an insane delusion which covers every possible case is a difficult one. Nonetheless, a general rule has evolved that it must be, as its name implies, an

---

**3.** A decedent possesses testamentary capacity if he has an intelligent knowledge regarding those who are the natural objects of his bounty, of what his estate consists, and of what he desires done with it, even though his memory has been impaired by age or disease. *In re Franz' Estate*, 368 Pa. 618, 622, 84 A.2d 292, 293, 295 (1951). Since we find that the decedent was not suffering under an "insane delusion" at the time the Will at issue was drawn, *see* discussion *infra*, we find that she possessed the requisite testamentary capacity to execute the Will.

insane delusion, and it must have caused decedent to make his Will in a manner entirely different from what he would have if the insane delusion did not exist. *In re Estate of Protyniak*, 427 Pa. 524, 235 A.2d 372 (1967). As our Supreme Court observed in the case of *In re Johnson's Estate, supra*, 370 Pa. at 129, 87 A.2d at 190:

> " 'It is well settled that "A delusion which will render invalid a [W]ill executed as the direct result of it is an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist." ' " (Citation omitted)

The Court further pertinently said in *In re Sommerville's Estate, supra:*

> "[I]t is not enough that the testatrix should have a delusion—it must be an insane delusion. This distinction has been clearly drawn ever since 1902 when this Court in *Bennett's Estate*, 201 Pa. [485] at page 490, 51 A. at page 336, supra, said:
>
> 'But all delusions are not insane delusions. A man may, from information given him, believe that his son is dead, when in point of fact, the son is alive. The father's belief is a *delusion;* and if, when his son appears to him in person and explains the information was false, the father persists in thinking him dead, his belief becomes an *insane delusion.* The difference between the two species is that one is the product of reason, and the other a figment of the imagination.' " (Emphasis in original) *Id.* 406 Pa. at 220, 177 A.2d at 502.

■ As stated earlier, the burden of showing that decedent was suffering from an insane delusion and that such controlled her volition and destroyed her freedom of action in disposing of her estate was on contestants-appellants. To meet this, appellants cite us to "the most persuasive evidence of decedent's 'insane delusion'." That is, "the stories which decedent told the various witnesses[, who testified at trial,] as to why she rewrote her [W]ill to

downgrade her daughter, Maria." Specifically, appellants make reference to the following:

"Florence Agostini, wife of proponent, Louis Agostini, testified decedent told her that Maria had not changed the dressing on her feet as often as she was supposed to ...; Rena McHugh said that decedent told her Maria had gone away and [had] not changed the dressing on her feet three times daily as Dr. Borska had prescribed ... that decedent said Maria went away for six days ..., then said decedent never stated that Maria was not taking care of her ..., then testified decedent said Maria went away for six days ..., then said decedent was mad at Maria because Maria did not call while away ...; nurse Elaine Volk called by proponents testified decedent told her she was angry at Maria because it was Maria's fault that her feet were scalded ... and no other complaint [was made to the nurse] about Maria and [decedent] never complained that Maria had not properly cared for her ... and [decedent] never said [to the nurse] that Maria had gone away and left her unattended for six days ...; proponent Helen Mickel testified decedent told her Maria left decedent unattended for three days ...; decedent told Thomas Timoney, Esquire that Maria had left decedent unattended [for five days] ...; and Jean Jennings testified that decedent said Maria left her unattended for 5–6 days.

Maria testified that she changed the dressings on her mother's feet three times every day as Dr. Borska directed ...; her husband, Richard, verified that Maria never was away a single day ...; and Dr. Borska confirmed that his instructions for [the] care of [the] decedent had been carried out ...." (Appellants' Brief at 12–14)

Additionally, appellants point to the psychiatric testimony of Drs. Sibert and Kilgour. The former considered the decedent to be "regressed," vulnerable to mispreceptions, childish and illogical, as well as prone to being suspicious, paranoid and subject to turning first on her family. Doctor Kilgour found decedent to be suffering from organic brain syndrome and an insane delusion. However, of relevancy

244

here is that *both psychiatrists had never seen or interviewed the decedent.* In fact, their medical opinions on decedent's testamentary capacity were predicated upon a review of the hospital records furnished by the Chestnut Hill Hospital where decedent stayed, a reading of the trial record and Maria's testimony at the proceedings. (RR. 584a & 690a) Because of these circumstances, the testimony ("opinion") of the psychiatrists is entitled to little weight. *See In re Estate of Brantlinger,* 418 Pa. 236, 248, 210 A.2d 246, 253 (1965); *Masciantonio Will,* 392 Pa. 362, 384, 141 A.2d 362, 373 (1958); *In re De Maio's Estate,* 363 Pa. 559, 562, 70 A.2d 339, 341 (1950). "We are concerned with testatrix's mental capabilities at the time she executed the [W]ill, and testimony of her condition close to that time must be considered more significant." (Citations omitted) *In re Estate of Brantlinger, supra,* 418 Pa. at 248, 210 A.2d at 253; *see also In re Estate of Hastings, supra; In re Dovci's Estate,* 174 Pa.Super. 266, 270, 101 A.2d 449, 451 (1953). Evidence of such state of mind may be received for a reasonable time before and after execution as reflective of decedent's testamentary capacity. This information can be supplied by lay witnesses as well as experts. *See In re Estate of Kuzma,* 487 Pa. 91, 94, 408 A.2d 1369, 1371 (1979). In this regard, the doctors who treated decedent during her stay in the hospital testified to her mental condition. In particular, Dr. Messori, the attending physician, recalled that from April 7 through May 21 of 1979 he visited the decedent fifteen times, for approximately ten minutes per visit. He engaged the patient in conversation about her general medical problems and advised her of the appropriate care. Based on such discussions and Mrs. Agostini's physical condition, Dr. Messori was of the opinion that: "Mrs. Margaret Agostini did not have any impairment of intellectual function up until and including May 21st." (RR. 1101a) Subsequent examinations by the witness on May 23 and 25 did not alter his initial view. It was not until June 16, 1979 that the witness observed a deterioration in decedent's mental and physical condition.

As for Dr. Brobyn, who was the plastic surgeon on the case and saw the decedent fifteen times between April 7 and May 16, 1979, his opinion of decedent's mental condition was consistent with Dr. Messori's. (RR. 1182a–1183a)

Appellees also presented the testimony of Elaine Volk, the head nurse of the isolation unit, who spoke with the decedent on numerous occasions during her initial 5-day stay (April 7–12 of 1979) in that area of the hospital. The witness found the decedent to be "alert and oriented to person, place and time." (RR. 778a) When the decedent returned to isolation on May 18 through May 25, to minimize the likelihood of infection, the witness' opinion of the decedent remained unchanged. (RR. 787a) For example, the witness detected no signs of memory impairment, confusion or disorientation on the part of the decedent. (RR. 789a)

Counsel who prepared decedent's December 8, 1978 Will testified that on May 18, 1979 he received a message to see the decedent at Chestnut Hill Hospital. At that time, decedent informed counsel of the circumstances leading up to her injury and that she wanted to make another Will so as "to treat Maria substantially different in a new [W]ill than in the old [W]ill, that she had had a dispute with Maria." (RR. 948a) She said that the dispute was over the amount of care she expected Maria to give her at home after the injury; and that the dispute became so heated that she told Maria, "Leave me and don't come back. I don't want you in my house anymore." (RR. 952a) Furthermore, decedent told counsel that a new Will was warranted because "a lot of money had been spent on both [Maria and Marco] . . ., [and] she didn't feel she owed them anything." (RR. 956a)

Counsel complied with his client's wishes and drew up a new Will. On May 21, 1979 the document was presented to the decedent, who manifested no indicia of a weakened intellect. Each paragraph of the instrument was read and then commented upon by the decedent. At this time, decedent reaffirmed her desire to have the new Will finalized,

despite the change in the disposition of some property regarding certain beneficiaries. Thereafter, the Will was signed and witnessed by counsel and Diana Cargo, a nurse on duty.

 It would serve no purpose to detail further and discuss the testimony. We have carefully reviewed the entire record (consisting of 10 volumes of testimony and exhibits) and find it free from legal error, abuse of discretion, or capricious disbelief of competent or credible evidence. Also, we find that, since a substantial dispute was raised by the evidence, it was for the fact finder to determine whether or not the testatrix had testamentary capacity. We are of the opinion, therefore, that the lower court did not err in refusing to hold as a matter of law that the Will was invalid due to alleged delusions entertained by the testatrix. *See In re Estate of Hastings, supra,* 479 Pa. at 128–129, 387 A.2d at 868–869; *In re Duncan's Will,* 147 Pa.Super. 133, 23 A.2d 357 (1941).

Lastly, appellants maintain that the Will is invalid because it was the product of undue influence imposed upon testatrix by Rena McHugh. As the lower court stated on this subject:

"The evidence is simply insufficient to support the contention.

The uncontradicted testimony is that Rena McHugh was not present during the conversations the decedent had with her attorney. Neither Rena nor Jack McHugh contacted Mr. Timoney to arrange for the change of the [W]ill. The latter testified that, throughout his discussion with the decedent, Rena McHugh's behavior or influence was never mentioned. The decision to decrease the contestants' share was that of the decedent alone. She remained steadfast in her decision. Elaine Volk testified that the decedent expressed dissatisfaction with her daughter before Rena McHugh ever visited her. So clearly, Rena could not have been the origin of that emotion.

In that connection, the contestants charge Rena McHugh with reinforcing decedent's dissatisfaction with Maria. There is no concrete evidence to support the proposition. While it may be true that Rena McHugh flattered the decedent and stressed her own poor financial status, and may even have artfully suggested that Maria seemed well off, this is not enough to establish that she exercised such control over the decedent as to overpower the decedent's free will. This is particularly the case here where decedent's history and actions suggest a strong personality.

The contestants assert that Rena and Jack McHugh took steps designed to gain control over all of the decedent's assets. Indeed, Louis Agostini was contacted to aid in the contemplated transfer of the decedent's funds to the Scranton area. But this was not initiated by Rena McHugh. On the contrary, it was the decedent's idea. Furthermore, after an intitial [sic] inquiry by Louis at a Scranton bank, the matter was apparently not pressed by any of the parties, including the decedent.

Finally, it is to be noted that decedent's action in changing her will because she was angry with someone who was a beneficiary named in her [W]ill was entirely consistent with her history. Decedent changed her [W]ill often, for a variety of reasons, including that of taking a transgressor—real or imagined—out of the [W]ill. It is clear she did so here for reasons she felt sufficient, and not under the control of Rena McHugh. She was not obligated to disclose her reasons for disinheriting her daughter. A parent owes no obligation to his children to leave them any property. *Estate of Sommerville,* 406 Pa. 207, 177 A.2d 496 (1962).

We conclude that the contestants have not sustained their burden of proving undue influence." (Lower Court Opinion at 8–10)

In face of the aforementioned, which we find no reason to dispute, appellants argue that the burden shifted to the proponents-appellees to prove that the questioned document

of May 21, 1979 was not the result of undue influence for the reason that a weakened mentality and confidential relationship were proved. (Appellants' Brief at 34)

■ It is clear to us, as it was to the court below, that appellants failed to establish the existence of a confidential relationship which, coupled with the weakened mentality,[4] would have shifted the burden to proponents-appellees to prove that testatrix's Will was not procured by the exercise of undue influence. *See In re Estate of Treitinger*, 440 Pa. 616, 269 A.2d 497 (1970); *In re Estate of Brantlinger*, *supra*.

■ Thus, with the burden upon the appellants to establish undue influence, they were required to show by clear and convincing evidence that there was imprisonment of the body or mind, fraud or threats or misrepresentation, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testatrix or destroy her free agency, or to operate as a present restraint upon her in the making of the Will. *Quein Will*, 361 Pa. 133, 145, 62 A.2d 909, 915 (1949). There is nothing in the instant record to show that Rena McHugh, or for that matter any other person, exercised any such control over testatrix in the making of her Will. In other words, the record is barren as to any indication that any type of influence was exercised upon or directed toward decedent by any one concerning the formulation and carry-

4. In view of our determination that appellants did not establish a confidential relationship, we need not decide whether there was sufficient evidence in the record to warrant a finding of mental weakness for the purpose of shifting the burden to proponents to disprove undue influence. *See In re Estate of Brantlinger, supra.* This also holds true with regard to the third prong of the tripartite test—proof that the proponents received a "substantial benefit" under the contested Will—that needs to be established by the contestants before the burden of proof would shift back to the proponents of the Will to disprove undue influence. *See generally Estate of Reichel*, 484 Pa. 610, 400 A.2d 1268 (1979); *In re Estate of Button*, 459 Pa. 234, 328 A.2d 480 (1974). However, we do mention, without deciding, that it is questionable whether Rena McHugh's share under the May 21, 1979 Will, although an increase over the December 8, 1978 Will, would be considered substantial. *See, e.g., In re Estate of Button, supra.*

ing out of her testamentary plans. Also, no other person made the arrangements for her consultation with her attorney on the subject; in fact, she phoned counsel herself. Nor was anyone present when testatrix discussed the drafting with him. Indeed, according to the uncontradicted testimony of the lawyer-scrivener, decedent was quite emphatic and definite in her decision despite questioning by the attorney on the subject at the time. *See In re Estate of Abrams,* 419 Pa. 92, 100, 213 A.2d 638, 643 (1965); *In re Franz' Estate,* 368 Pa. 618, 84 A.2d 292 (1951) and compare with *In re Estate of Clark,* 461 Pa. 52, 334 A.2d 628 (1975) and *Kees v. Green,* 365 Pa. 368, 75 A.2d 602 (1950). Consequently, we are in agreement with the court below that appellants presented no clear and convincing evidence of undue influence which would be sufficient to void the Will. *In re Estate of Protyniak, supra.*

### Appeal at No. 221 Philadelphia 1982

This case deals with appellants' appeal from the lower court's order, affirmed by a court en banc, directing a lending institution to release the assets it held in the name of the decedent to the estate. We affirm.

The facts pertaining to the instant litigation, which are based upon the testimony and exhibits produced in the Will contest case and three separate Stipulations of Counsel, consist of the following: From 1972 through the latter part of 1978, decedent made her home in Florida. Subsequent thereto, she returned to Pennsylvania and resided here until her death. While decedent was domiciled in Florida, she obtained three certificates of deposit in the amount of $5,000 each. Certificate No. 59115 was issued to: "Margaret Agostini, Trustee, Luisa Leps, Beneficiary." Accounts No. 59116 and No. 59117 had similar designations for Richard Leps, Jr., and for Steven Leps. The three named beneficiaries are Maria's children and decedent's grandchildren. It so happened that on the same day that decedent affixed her signature to the contested Will, she mailed a handwritten letter to the Florida bank that issued the

certificates and asked that the beneficiaries be removed and her name placed thereon. The bank, by letter dated May 24, 1979, responded and specified that, before any changes could be effectuated, its own internal operating procedures would have to be complied with, and this included the return of the certificates to the bank. However, the bank's procedures were never followed by the decedent.

After decedent's death, Maria secured the proceeds of the certificates and deposited the funds in her own name in trust for her children at the Bank and Trust Company of Old York Road, Dresher, Pennsylvania. Upon petition by appellees, the funds were "frozen" by order of the lower court.

Appellants urge that: 1) the lower court erred in concluding that Pennsylvania law, rather than Florida law, controlled the determination of what legal consequences resulted from decedent's purchase of the certificates registered in her name as "trustee" for the grandchildren; and 2) that the lower court erred in concluding that even if the certificates were tentative trusts, the evidence was sufficient to prove that decedent revoked the "trustee" registration.

As to appellants' first averment, concerning whether a tentative trust or a completed gift resulted from the registration of the certificates in decedent's name as trustee for her grandchildren, we determine that Pennsylvania law, rather than Florida law, controls. Such finding is predicated upon the rule set forth in *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

In *Griffith*, plaintiff's decedent purchased an airlines ticket from United Air Lines, Inc., in Philadelphia for a flight to Phoenix, Arizona. This passenger was killed when the plane crashed in the course of landing at Denver, Colorado. United is a Delaware corporation with its principal place of business in Chicago. It regularly does business and maintains operational facilities in Pennsylvania. Decedent's Will was probated in Pennsylvania and his survivors resided therein. An action in assumpsit was brought in Pennsylvania by decedent's executor, pursuant to the Fidu-

ciaries Act of April 18, 1949, P.L. 512, § 603; 20 P.S. § 320.603. Preliminary objections were filed, and the lower court held that the law of the place of the injury, Colorado, not the law of the forum, Pennsylvania, controlled the matter of damages. Since plaintiff may have recovered substantial damages under Pennsylvania law, but virtually nothing under Colorado law, he appealed.

In an exhaustive examination of the law of conflicts, the Supreme Court reversed and said that under such a state of facts, the law of the forum would be applied. By so doing, the Court embraced a "government interest analysis" approach for resolving choice of law questions. *See Harrison v. Wyeth Laboratories*, 510 F.Supp. 1 (E.D.Pa.1980). This flexible approach permits analysis of the policies and interests underlying the particular issue before the court, and gives the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation. *Griffith v. United Airlines, Inc., supra*, 416 Pa. at 21–22, 203 A.2d at 805–806; *Abiaad v. General Motors Corp.*, 538 F.Supp. 537, 543 (E.D.Pa.1982).

We observe that Pennsylvania has not restricted the application of this flexible choice of law solely to conflict questions involving torts. *See, e.g., In re Adoption of Hunter*, 421 Pa. 287, 218 A.2d 764 (1966) (question of whether law of West Virginia or Pennsylvania applied in deciding if natural mother "consented" to adoption); *Nationwide Mutual Insurance Co. v. Walter*, 290 Pa.Super. 129, 434 A.2d 164 (1981) (New Jersey rather than Pennsylvania was determined to have the most vital contacts, so New Jersey law was looked at to interpret insurance contract); *Gillan v. Gillan*, 236 Pa.Super. 147, 345 A.2d 742 (1975) (validity of separation agreement); *see also Argo Welded Products v. J.I. Ryerson Steel & Sons*, 528 F.Supp. 583, 586 & n. 6 (E.D.Pa.1981) (Pennsylvania applies the same choice of law—interest of analysis approach—to con-

flict questions involving tort, contract or sales); *Culbreth v. Simone*, 511 F.Supp. 906, 913 (E.D.Pa.1981) (contract).

Thus, contrary to appellants' position that *Griffith* be construed to apply only to tort cases, we find that *Griffith* and its progeny articulate an approach to all conflicts of law which call for the application of the law of the state having the most significant contacts or relationships with the particular issue. *Griffith v. United Airlines, Inc., supra*, 416 Pa. at 22, 203 A.2d at 806. When doing this, it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale. *Cipolla v. Shaposka*, 439 Pa. 563, 566, 267 A.2d 854, 856 (1970). When applied to the case at bar, this means we must determine which state—Pennsylvania or Florida— "has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *McSwain v. McSwain*, 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). We wish to make it clear, the applicability of the "government interest analysis" approach is not rendered inoperative in the context of the probate of an estate. *See In re Estate of Janney*, 498 Pa. 398, 446 A.2d 1265 (1982) (in the probate of an estate where the decedent, domiciled in Pennsylvania, devised realty in New Jersey, the law of the situs was superceded by the law of the domicile state because the formalities in question complied with the requirements of the state of domicile); *Gillan v. Gillan, supra* (*Griffith* overruled a substantial body of Pennsylvania case law and adopted the new Restatement of Conflict of Laws (Second) § 379 approach to conflicts problems); *Grant v. McAuliffe*, 41 Cal.2d 859, 264 P.2d 944, 949 (1953); *D'Urbano Estate*, 29 Fid.Rptr. 557 (O.C.Montg.Cty.1979).

To begin with, since the certificates of deposit have been redeemed and the proceeds "frozen" by court order in a Pennsylvania bank, the decedent's entire estate is now located here and waiting to be distributed. Additionally, letters of administration were issued to the appellees by a

court of this Commonwealth, and, therefore, a Pennsylvania court retains control over the administration of the estate. Consequently, when, as in the present case, all of the parties are domiciliaries of this Commonwealth and the estate of the deceased is being administered here, our Commonwealth is vitally concerned with all facets of the distribution of decedent's property. *See Griffith v. United Airlines, Inc., supra; Grant v. McAuliffe, supra; D'Urbano Estate, supra.*

Even though Florida *was* the domicile of the decedent at the time the certificates of deposit were acquired, this is hardly sufficient to give Florida an interest in the application of its policies concerning trust accounts. Moreover, given the fact that Florida does subscribe to the "tentative" trust doctrine, *Seymour v. Seymour,* 85 So.2d 726 (Fla. 1956) (Savings account), we are in actuality doing exactly what Florida would do by deciding whether the certificates of deposit[5] were effectively revoked by the decedent prior to her death, so as to bring the proceeds within the corpus of the estate for distribution purposes.[6] *See* Title 38, Chap-

---

**5.** For edification purposes, we note that prior to 1976 the tentative or revocable trust was permissible but was limited to bank accounts in Pennsylvania and was created when one deposited money to his or her own name in trust for another. *See Ingels Estate,* 372 Pa. 171, 92 A.2d 881 (1952); 3 Remick's Pennsylvania Orphans' Court Practice § 25.03(b)(9), at 295 (Rev.1978). In 1976, the Legislature extended the law to embrace certificates of deposit under the "tentative" trust doctrine. Act of 1976, July 9, P.L. 547, No. 134, §§ 1 and 2, eff. September 1, 1976; 20 Pa.C.S.A. §§ 6301 and 6304 (Supp.1982–83); *see also Nace et al., Executors v. The Fulton County National Bank,* 79 D. & C. 325 (Fulton, 1951).

**6.** Appellants cite us to the case of *Seymour v. Seymour,* 85 So.2d 726, 727 (Fla.1956) to show that Florida has not seen fit to extend the Totten trust doctrine beyond the context of a "savings account," and, therefore, argue that decedent made a gift of the certificates of deposit to Maria's children rather than establishing a trust account. We disagree with appellants on two counts. First, there has been no evidence presented that a gift inter vivos was intended by the decedent, especially in light of the fact that the decedent retained possession of the certificates until her death. *See Reist's Estate,* 158 Pa.Super. 281, 44 A.2d 847 (1946); 17 P.L.E. Gifts § 6 (1959). Secondly, although the courts of Florida may not have seen fit to extend the Totten trust doctrine beyond the confines of the savings account, *see*

ter 658, Section 658.56 of the Florida Banking Code, 19 Fla.Stat.Anno. § 658.56(1) & (2) (Supp.1982) (Presumption that right, title and interest to the proceeds of a certificate of deposit are to devise to surviving account holder or holders may be overcome only by proof of fraud or undue influence or clear and convincing proof of a contrary intent). Thus, based on the preceding, there would appear to be no real conflict of laws in this case. *See, e.g., Kuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897 (1966); *McSwain v. McSwain,* 420 Pa. 86, 215 A.2d 677 (1966); Traynor, Robert J., *Is This Conflict Really Necessary?* 37 Tex.L.Rev. 657, 670 (1959); *see also* Egnal, John David, *The "Essential" Role Of Modern Renvoi In The Governmental Interest Analysis Approach To Choice Of Law,* 54 Temp.L.Q. 237 (1981).

Having decided that the law of this jurisdiction is to be viewed as the benchmark against which the validity of decedent's (attempted) revocation of the tentative trusts is to be measured, we can now turn to appellants' second averment, i.e., was there sufficient proof presented to establish that decedent revoked the "trustee" certificates. We commence this discussion by observing that:

> *Seymour v. Seymour, supra,* it certainly cannot be attributed to the absence of a law on the subject. Section 658.58, Tit. 38, Chap. 658 of the Florida Banking Code provides:
>
> **"658.58 Deposits in trust**
>
> When a bank deposit is made by any person describing himself as, and making such deposit as, trustee for another and no other or further notice of the existence of the terms of a legal and valid trust than such description shall have been given in writing to the bank, the deposit or any part thereof, together with the dividends or interest thereon, may, in the event of the death of the person so described as trustee, be paid to the person for whom the deposit was thus stated to have been made."
>
> The factual accounting in *Seymour,* although dealing specifically with the revocability of a Totten trust in the nature of a savings account, is not to be read to preclude the extension of the Totten trust doctrine to encompass certificates of deposit. This is especially so since the Florida statute in question (19 Fla.Stat.Anno. § 658.58 (Supp.1982)) does not so proscribe the scope of the Totten trust. Moreover, the Florida Legislature has recognized the establishment of a joint account in the context of a certificate of deposit. 19 Fla.Stat. Anno. § 658.56 (Supp.1982).

"Where property of any kind (with exceptions hereinafter discussed) is placed in the name of the donor or settlor *in trust for a named beneficiary,* the *general principle* of law is well settled that such facts create a trust which is prima facie *irrevocable.*

* * * * * *

However, an exception to the general principle was engrafted onto and was incorporated in the law of Pennsylvania with respect to a deposit in a savings account by one person *of his own money,* in his own name as trustee for another. · *Scanlon's Estate,* 313 Pa. 424, 169 A. 106, ... which adopted the New York rule laid down in *In re Totten,* 179 N.Y. 112, 71 N.E. 748, 70 L.R.A. 711, is the leading case. The law is well summarized in the syllabus in *Rodger's Estate,* 374 Pa. 246, 97 A.2d 789, supra, which reads:

'1. A [savings] bank deposit by one person of *his own money,* in his own name, as trustee for another, standing alone, creates merely a tentative trust, revocable at will, until the depositor dies or completes the gift in his lifetime.

'2. A tentative trust may be revoked, among other means, by (1) oral declarations of the depositor, and (2) facts and circumstances resulting in inadequacy of the estate assets to satisfy the testamentary gifts, funeral and administration expenses, taxes and other charges.

'3. Restatement, Trusts, § 58, cited.

'4. It was Held that the testimony of the scrivener of decedent's [W]ill as to his conversations with the testatrix leading to the preparation of her [W]ill was admissible to show her intention that the tentative trust be revoked.

'5. It was Held that the circumstantial evidence was insufficient to establish that settlor intended to make the tentative trust irrevocable.

However, the tentative trust doctrine has never been extended to any property other than a savings account (or savings share account in a building and loan association)

where the *donor with his own money opened such an account in his own name in trust for the donee*[.]

\* \* \* \* \* \*

In *Ingels Estate*, 372 Pa. pp. 176–177, 92 A.2d pp. 883–884, supra, the Court said:

'The presumption that a revocable trust is intended by such a deposit *is an exception to the general rule that trusts are irrevocable* unless a power of revocation is expressly [or impliedly] reserved. \* \* \* Because the exception depends on the peculiar circumstances of this type of transaction, *we have never extended the doctrine of tentative trusts to any property other than a savings account.* "It is clear that a similar trust of property other than savings bank deposits would be invalid." ' " [7] (Emphasis in original) (Footnotes omitted) . *In re Brose's Estate*, 416 Pa. 386, 396, 206 A.2d 301, 306–307 (1965).

That portion of the *Brose* case cautioning that the tentative trust had not been extended beyond the strictures of a savings account or a savings share account is no longer viable. In 1976, the Legislature of Pennsylvania promulgated the Act of 1976, July 9, P.L. 547, No. 134, §§ 1 and 2, eff. September 1, 1976; 20 Pa.C.S.A. § 6301 and 6304 (Supp.1982–83) and enlarged the "trust account" to include: "a checking account, savings account, certificate of deposit, share account and other like arrangements." 20 Pa.C.S.A. § 6301.

■ No one contends, and the record does not indicate otherwise, that the certificates of deposit, captioned "Margaret Agostini, Trustee" for three separate beneficiaries, were not secured with the decedent's own money. Thus, it cannot be denied that the certificates were tentative trusts.

7. This undermines appellants' contention that "a trust is irrevocable in the absence of an express power of revocation and will be enforced in favor of the *beneficiaries* ... *Wilson v. Anderson*, 186 Pa. 531 [40 A. 1096] (1898) and cases collected at 6 *Hunter's Orphans' Court Commonplace Book*, vol. 6 revised, Trusts Inter Vivos 11(b)." (Appellants' Brief at 14) Appellants' position is untenable because the authorities cited for such proposition antedate the *Scanlon's Estate*, 313 Pa. 424, 169 A. 106 (1933) decision.

*In re Brose's Estate, supra.* Such being the case, we must now look to the manner in which the trusts could be revoked by the settlor. On this exact topic, this Court has stated:

"A tentative trust can be revoked by the depositor at any time prior to death by any *clear manifestation of an intention to do so.* No particular formalities are necessary to effect a revocation. Restatement of Trusts 2d, § 58, comment c. It may be revoked by a transfer of the deposit; by the terms of the depositor's [W]ill; *by the depositor's unequivocal act* or declaration *of disaffirmance;* or by facts and circumstances resulting in inadequacy of the estate assets to satisfy the testamentary gifts, funeral and administration expenses, taxes and other charges.

There is no rule which excludes oral declarations of revocation. Pennsylvania courts, on the contrary, have repeatedly said that a depositor may revoke a tentative trust by oral declaration." (Emphasis added) (Citations omitted) *Estate of Vittorio,* 290 Pa.Super. 329, 332, 434 A.2d 777, 779 (1981).

What was the evidence of revocation which satisfied the chancellor and orphans' court en banc instantly? The court en banc found "that decedent's letter, dated May 21, 1979, to the First Family Federal Savings & Loan was a clear revocation of the trust." (Lower Court Opinion at 6) We agree. The letter in question reads:

"May 21—1979

Dear Mr. Scneider [sic]:—

I wish to ask you if you would *put my certificates in my name only with no beneficiares [sic] attached.* I may not redeemed [sic] them and if I can manage without them I would like them to remain in your bank.

Tomorrow I am having my big toe amputated and *dont want any beneficiares on the certificate.* [sic] They [sic] doctor said I should not worry but naturally I do. Thanking you.

/s/ Mrs Margaret Agostini

Certificates are

 59115
 59116
 59117

Penn Weldy Apts

1300 Penna Av

Oreland Pa. N—1

19075

Excuse writing but I am a little shaky—Please let me no [sic] if you can take care of the change—" (Emphasis added)

We find that the aforecited declaration, the *sole* evidence upon which the lower court concluded that the decedent revoked the tentative trust certificates of deposit, did "constitute a clear, unequivocal, immediate disaffirmance or revocation of the trust[s]." *Estate of Vittorio, supra,* 290 Pa.Super. at 335, 434 A.2d at 781; *see In re Rodgers' Estate,* 374 Pa. 246, 249, 97 A.2d 789, 791 (1953) ("Indeed, the original statement of the Totten rule quoted in Re Scanlon's Estate, supra, clearly implies that revocation may be accomplished by ' "some decisive act or declaration of disaffirmance" '."); 20 Pa.C.S.A. § 6304(b) (Supp.1982–83) ("Trust account.—At the death of the trustee ..., any sum remaining on deposit belongs to the person or persons named as beneficiaries, if surviving ..., unless there is clear and convincing evidence of a contrary intent[.]").

A fair reading of the letter evinces that the writer wanted to have her "name only" on the certificates "with no [other] beneficiaries." In fact, to emphasize this point, decedent reiterated in the letter that she did not "want any beneficiaries on the certificate[s]." Ergo, we conclude, notwithstanding the decedent's failure to comply with the *bank's* internal operating procedures for revoking the trust certificates, that the declaration relied upon by the court en banc to find a termination of the tentative trusts was the equivalent of a clear, unequivocal and decisive establishment of a *present disaffirmance and revocation of said certificates.*

*See In re Rodgers' Estate, supra; see generally Estate of Vittorio, supra.*

Orders affirmed.