625 A.2d 57

**In re Mamie Myrtle BLOCH, Deceased.**

**Appeal of Mildred CONWAY, Cora Fox and Hiram Becker.**

Superior Court of Pennsylvania.

Argued Feb. 18, 1993.

Filed May 11, 1993.

Richard J. Makoul, Allentown, for appellants.

Robert M. Davison, Bethlehem, for participating parties.

Before BECK, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Lehigh County, Orphans' Court Division, dismissing the appeal of the Appellants [1] from the decree of the Register of Wills admitting to probate the will and codicil of Mamie Myrtle Bloch, deceased. We affirm.

The record discloses that the Appellants filed a petition for declaratory judgment [2] seeking to invalidate the 1983 will of the decedent on grounds of undue influence, breach of the attorney-client relationship by the scrivener of the will (Charles E. Shoemaker, Jr., hereinafter "Charles Jr."), noncompliance with conditions precedent by the beneficiaries and the scrivener's violation of the Rules of Professional Responsibility (1.8 [3]) in preparing a will in which his father (Charles E. Shoemaker, Sr., hereinafter "Charles Sr.") and his paramour (Cheryl Passaro) were the residuary legatees.

A hearing was conducted on January 16, 1991, wherein it was recounted that in April of 1983, the decedent inquired of Charles Sr. if he could recommend an attorney to assist her and her husband in preparing wills. Charles Sr. indicated that his son, Charles Jr., was an attorney.

Thereafter, the Blochs made an appointment with Charles Jr. During the course of the meeting, the Blochs indicated their intention to allow for disposition of each's estate to the other. Should one predecease the other, however, the remaining estate was to be divided equally between Charles Sr. and Ms. Passaro. Also, Charles Sr. was to be designated as executor should Mr. Bloch not survive his wife.

When counsel asked why such a distributive scheme, when there were existing family members, the Blochs explained that: "They were not on close terms with any of the family

1. The Appellants/petitioners are the sisters and brother of the decedent, i.e., Mildred Conway, Cora Fox and Hiram Becker.

2. The Act of June 18, 1923, P.L. 840, as amended, 12 P.S. § 831 *et seq.,* and now found at 42 Pa.C.S.A. § 7531 *et seq.*

3. Rule 1.8 reads: "A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent ... any substantial gift from a client, including a testamentary gift...."

members, and that this is what they had planned to do, and this is what they had wanted to do." N.T. 78. Specifically, when Charles Jr. asked as to the natural objects of their bounty (i.e., brother, sisters, niece and nephew), the Blochs "chose not to leave any thing to any of those people." N.T. 175. Charles Jr. did not recall the "exact language used [by the Blochs], but it was not complimentary to the family members. *What they desired to do was to—, to make a gift to the two people they were closest to."* [4] Id.

In compliance with the wishes of the Blochs, Charles Jr. prepared their wills and forwarded them for review. Included in the documents were identical Articles IV and V, which read:

ARTICLE IV. *GIFT OF PERSONAL AND HOUSE-HOLD EFFECTS*

I give all my automobiles, and all my other articles of personal or household use, together with all insurance relating thereto to my [spouse], if [s/]he survives me by thirty (30) days. If [s/]he does not so survive me, I give all such property to Charles E. Shoemaker, Sr. and Cheryl Passaro, in equal shares, who have agreed to care for my [spouse] and myself for as long as we each shall live, utilizing any or all of such property for this purpose, and who have agreed to care for my dog and cats for as long as said shall live.

ARTICLE V. *RESIDUARY ESTATE*

4. The record is consistent with a finding that the decedent was "very good friends" with Charles Sr. and Ms. Passaro, who were joint owners of a beauty salon the decedent frequented twice a week since 1976.

It was not unusual for either Charles Sr. or Ms. Passaro to pick up Mrs. Bloch at her home and transport her to the beauty salon and back home.

The trio socialized. Ms. Passaro visited the decedent at her home and phoned her when she failed to come into the beauty salon. Ms. Passaro described her friendship with the decedent as "extraordinary", which is consistent with Charles Jr. remarking that Mrs. Bloch referred to Ms. Passaro as a "daughter". ·

Ms. Passaro visited the decedent when she was in the hospital; the two exchanged holiday and birthday cards, and it was not unusual for the two to embrace each time they saw each other at the beauty salon.

As for Charles Sr., he was "very good" friends with the decedent and did some occasional painting and/or made repairs to the decedent's home. The two would have lunch together, and Charles Sr. would pick up Mrs. Bloch and take her home from the beauty salon.

I give, devise and bequeath the rest, resideue [*sic*] and remainder to my [spouse] ... if [s/]he survives me by thirty (30) days. If [s/]he does not so survive me, I direct that the rest, residue and remainder of my estate shall be divided into two (2) equal shares and distributed to Charles E. Shoemaker, Sr. and Cheryl Passaro, in equal shares, who have agreed to care for my [spouse] and myself for as long was we each shall live, utilizing any or all of such property for this purpose, and who have agreed to care for my dog and cats for as long as said shall live.

Also, Charles Sr. was named as the contingent executor should Mr. Bloch predecease Mrs. Bloch.

On April 19, 1983, the Blochs' wills were executed, witnessed and notarized (as self-executing wills) in counsel's office. The next time counsel heard from Mrs. Bloch was in 1986. Mr. Bloch had died and Mrs. Bloch asked Charles Jr. to probate her husband's will. This was accomplished. Late in 1986, Mrs. Bloch again contacted Charles Jr. to alter her will and make specific bequests of personal property to a variety of people. Counsel recommended that a codicil be drawn. Mrs. Bloch agreed and an amendment to the 1983 will was drafted and executed on December 31, 1986.

On July 27, 1987, Mrs. Bloch contacted Charles Jr. about changing her 1983 will and 1986 codicil in order to revise the distribution of her estate, a change which deleted Charles Sr. and Ms. Passaro and devised the property to the decedent's nephew (Jack Conway, who was to receive her two cats and dog) and sister (Mildred Conway, who was to be the recipient of a marble table).[5] The remaining portion of the estate and

---

5. In particular, Mrs. Bloch told Charles Jr. over the phone that the following items were to be distributed:

> ... the corner cupboard and its contents to go to her nephew and his wife, Jack and Peggy Conway, Senior. Marbletop table to go to her sister, Mildred Conway. They are to take whatever they want and then sell the rest of it. Sell the house, and divide the money between my sisters and brother, Mildred Conway, Cora Fox, Betty Crayosky, and Hiram Becker. Her nephew, Jack Conway, Senior, who looks after her now when she is sick, is to look after her animals, two cats and a dog.

N.T. 99.

all insurance were to be divided equally among the sisters and brother of the decedent, i.e., Mildred Conway, Cora Fox, Betty Crayosky (who has since died), and Hiram Becker. See Article 4, Exhibit 0–3.

Under the residuary clause of the proposed 1987 will, the previously named sisters and brother were listed as residuary legatees.

On August 26, 1987, Charles Jr. sent a letter with a copy of the new will to Mrs. Bloch. He directed her to review the instrument and make any corrections she deemed necessary. If there were no changes, Mrs. Bloch was to phone Charles Jr. for an appointment to execute the originals. This never came to pass.

Upon Mrs. Bloch's death, Charles Sr. and Ms. Passaro learned for the first time while attending her funeral that they were included in the decedent's will. When the decedent's 1983 will was submitted for probate by Charles Sr. and Ms. Passaro, the Appellants claimed the will was invalid and sought confirmation of this assertion by way of a Declaratory Judgment. Once a hearing had been held, the Orphans' Court dismissed the Declaratory Judgment as an incorrect procedure by which to assail the validity of the 1983 will. The proper course was to have the matter reviewed, initially, by the Register of Wills.[6]

The Register of Wills admitted the 1983 will and 1986 codicil for probate. On review by the Orphans' Court, which the parties stipulated could be limited to the testimony proffered at the January 16, 1991, hearing, the appeal of the decree of the Register of Wills' admission of the decedent's will and codicil was dismissed. This appeal followed.

The first issue raised by the Appellants concerns the claim that the will of 1983 is invalid on the basis that the

---

6. We would note our agreement with the Orphans' Court that a Declaratory Judgment is not the proper means by which to attack the validity of a will where the Register of Wills has not ruled on the matter initially. See 20 Pa.C.S.A. § 901; *Martin Estate,* 349 Pa. 255, 36 A.2d 786 (1944); *In re Craig's Estate,* 30 Somerset 377 (1975).

decedent was unduly influenced in the preparation of the document.

It is axiomatic that in this jurisdiction undue influence can be established by a showing that: 1) a person in a confidential relationship with a testatrix or testator, 2) received a substantial benefit under a will, and 3) the will was written by a testatrix or testator who was of weakened intellect. *Estate Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979). If all three elements are proven by clear and convincing evidence, the burden of proof shifts to the proponent of the will to prove affirmatively the absence of undue influence. *In re Estate of Agostini,* 311 Pa.Super. 233, 457 A.2d 861 (1983).

From our examination of the testimony offered at the January 16, 1991, hearing, we find that the decedent's friends, neighbors and next-of-kin depicted her as a self-styled, independent person who was not easily swayed in her thinking on a subject about which she felt strongly. She knew the objects of her bounty, was protective of her property and was lucid up until the final days of her life. The scrivener of the 1983 will confirmed that, at the time the will at issue was being prepared and discussed, the decedent "was aware of what she had, where she was, and what she was doing." N.T. 177.

In light of the absence of any evidence of a weakened intellect on the part of the decedent, the Appellants have failed to establish (one of the prongs necessary to prove) undue influence. See *In re Estate of Mammana,* 388 Pa.Super. 12, 564 A.2d 978 (1989), allocatur denied. Accordingly, this claim must fail.

The final issue, and a most interesting one, is whether the language appearing in Articles IV and V (reproduced supra) creates a condition precedent (the non-compliance of which is not disputed) invalidating the 1983 will so as to create an intestacy allowing for the Appellants to inherit as siblings of the decedent in preference to the Appellees/Charles Sr. and Ms. Passaro.

A condition is defined to be any qualification, restriction, or limitation annexed to a gift, and modifying or destroying

essentially its full enjoyment and disposal. Conditions on which estates are limited in wills may be precedent or subsequent. If precedent, the estate does not vest until the condition is fulfilled. If subsequent, it is liable to be divested on the subsequent failure of the condition. A condition precedent must be strictly, literally, and punctually performed. It may be valid although there is no ulterior limitation of the estate to which it is annexed. In construing a particular provision of a will, the intention of the devisor to create an estate on condition governs, but it must be manifested in express terms, or by clear implication, and it is to be gathered from the whole instrument and the existing facts.

*Adams v. Johnson, et al.*, 227 Pa. 454, 76 A. 174 (1910) (Citations omitted). Further, the preceding is to be read in light of the precept that where an intestacy would result were the gift held to be contingent, it is a consequence which the law always seeks to avert. *McCauley's Estate*, 257 Pa. 377, 101 A. 827 (1917). Thus, the absence of a gift over is indicative of a non-conditional gift. See *Brumbach's Estate*, 373 Pa. 302, 95 A.2d 514 (1953).

█ We believe that the language of the will, in light of the extrinsic facts and circumstances in this case, has created a latent ambiguity which made the introduction of parol evidence via Charles Jr. admissible. As our Supreme Court wrote in *Beisgen Estate*, 387 Pa. 425, 431, 128 A.2d 52, 55 (1956):

Where a latent ambiguity exists we have repeatedly held that parol evidence is admissible to explain or clarify the ambiguity, irrespective of whether the latent ambiguity is created by the language of the Will or by extrinsic or collateral circumstances. [Citations omitted]

Instantly, upon a review of the 1983 will and 1986 codicil, we find it proper for the Orphans' Court to have taken testimony on the intention of the testatrix because of the latent ambiguity which surfaces when the language in Articles IV and V is read in context. For example, nowhere did the testatrix make provision for an avoidance of intestacy had the legatees failed

to comply with the article in the will referencing the "care" to be provided to herself and her animals.

The 1986 codicil indicates clearly that the testatrix was aware of what a contingent (conditional) clause consisted of since one appears in that instrument.[7] However, the testatrix took no measure to state in specific, clear and unequivocal terms that a condition ("if, then") existed to the legatees taking under her 1983 will. See, e.g., *Adams,* supra; *Truxal v. Truxal,* 333 Pa.Super. 535, 537–38, 482 A.2d 1001, 1002–03 (1984).

Charles Jr. stated, repeatedly, that it was never the intention of Mrs. Bloch (or for that matter her husband) to condition (in a contractual sense) the receipt of the Bloch estate only after the performance of various conditions precedent as a prelude to inheritance; to-wit:

> My understanding was that ... Mr. and Mrs. Bloch, both, and independently, wished to leave the residuary of their estates, in the event that the other was dead, to my father and to Ms. Passaro. And because that—, when there are existing family members, that was so unusual that I asked for an explanation of why that was so. And the language that you see there, *perhaps less than artfully drafted,* was my attempt to explain why it was that my father and Ms. Passaro were named as the beneficiaries.

7. As herein relevant, the 1986 codicil read:
> FIRST: I direct that the following paragraph to inserted [*sic*] in my Last Will and Testament and made an integral part thereof, being deemed to have placement between Article IV and Article V.
> *"Gift of Specific Personal Property:* I give to the beneficiaries named herein, certain items of personal property listed on a Memorandum executed by me[—this was never provided in court]. This Memorandum may be changed from time to time and in such event the last dated Memorandum shall be the Memorandum applicable at the time of my death. In the event that such Memorandum is not found within thirty (30) days of the date of my death, it shall be presumed destroyed and this provision of my Will shall be deemed null and void. *In the event that any of the beneficiaries named in the said Memorandum fail to survive me, their gift thereunder shall lapse and become a part of my residuary estate."*
> SECOND: *I hereby ratify, confirm and republish my said Last will and Testament except insofar as any part thereof is revoked or modified by this Codicil.* [Emphasis added]

N.T. 184 (Emphasis added). Charles Jr. ascertained from Mr. and Mrs. Bloch that there was no contractual obligation by either party (Charles Sr. or Ms. Passaro) to do anything. On the contrary, the scrivener used the language ("agreed to care for") to explain their *motivation* for wanting to make the gift to the legatees. Id.; see also N.T. 82–83. Charles Jr. went on to explain:

If—, if I had understood, if Mr. Bloch and Mrs. Bloch had expressed to me that this was a contractual obligation, then I hope that I would have explained, and I feel confident that I would have explained, what a contractual obligation is, and the need to have a contract drafted, the need to negotiate a contract, or to set forth the terms somehow. In which case, then I would be in the middle between Mr. and Mrs. Bloch, and my father and Ms. Passaro. * * * But, under the circumstances, this was the reason that was given to me [by the Blochs] why the gift was going to be made. * * * And this was the motive for making the gift, but was—* * * But was not a contractual obligation. I never understood it to be a contractual obligation. * * * Neither Mr. or Mrs. Bloch ever expressed anything to me that suggested that there was any kind of a contractual obligation, or contractual relationship between them. This was simply, when I inquired, who do you want to leave your estate in the event that the other of you is deceased, why do you want to leave your estate to somebody other than a family member, *the explanation was given that there was not close relationships with the family members.*

N.T. 84–85 (Emphasis added). " 'Motives which prompt testators to bestow gifts are as varied as the gifts bestowed[, and t]he devise may refer to a service to be rendered, and yet not be conditional upon the rendition of such service.' " *In re Sommerville's Estate*, 417 Pa. 600, 604, 209 A.2d 299, 301 (1965) (Citation omitted). We find, as did the court below, such is the case at bar.

We cannot deny the fact that the phraseology utilized by the scrivener ("agreed to care for") was less than clear in expressing the testatrix' intention to make Charles Sr. and Ms.

Passaro the "unconditional" beneficiaries of her estate. As such, the Orphans' Court acted properly in examining the four corners of the 1983 will, the 1986 codicil and the existing facts in ascertaining the true intention of the testatrix. *In re Wachsetter's Estate*, 420 Pa. 219, 216 A.2d 66 (1966).

In the course of determining the intention of the testatrix, the scrivener of the will and codicil testified, in unequivocal terms, to the purpose sought to be achieved by the testatrix: devise her assets to non-blood relations (Charles Sr. and Ms. Passaro) to the exclusion of her blood relatives (brother, sisters and nephew). See *In re Agostini*, supra.

■ Because the Orphans' Court judge saw and heard the witnesses for both sides, he was in a much better position to determine the credibility of the witnesses to explain away the latent ambiguity. *Wachsetter's Estate*, supra. We, therefore, conclude that the testatrix did not wish to change or abrogate her 1983 will and/or 1986 codicil (which reaffirmed her will, see note 7, supra), and that under its terms and conditions hereinbefore recited, the Appellees are entitled to all of her residuary estate.[8]

Order affirmed.

8. The way Articles IV and V read, it would appear that the legatees were to provide for the needs of the testatrix and her animals *while she lived*, the resources to be used for the expenditure were to be the assets of her estate. Yet, both Charles Sr. and Ms. Passaro stated that the testatrix never spoke to either one about incurring any such obligations as a condition precedent to inheriting under her will. Therefore, they were unable ("impossibility of performance") to conduct any "caring" for Mrs. Bloch and/or her animals. See *In re Sommerville's Estate*, 417 Pa. 600, 209 A.2d 299 (1965).

This lends credence to the argument that the gift made by the decedent to the legatees was absolute, with no conditions assigned to acquiring an interest in the decedent's estate upon death. See *In re Sommerville's Estate*, supra.

Moreover, from the date of the execution of the 1983 will and her death in 1990, the testatrix had the opportunity to revoke her 1983 will in dictating a proposed distributive scheme in 1987 to Charles Jr. which would have replaced the present legatees with her blood relations. See discussion supra. Nonetheless, the decedent took no overt action to effectuate her intention to alter her 1983 will. Accordingly, given the inaction by the testatrix in 1987 to execute a new will, we see no reason to disturb the distributive scheme of the 1983 will.

To the extent that the scrivener's conduct is challenged as unethical behavior violative of the Rules of Professional Conduct, Rule 1.8(c), our Supreme Court has held that enforcement of the Rules of Professional Conduct does not extend itself to allow courts to alter substantive law or to punish an attorney's misconduct. *In re Estate of Pedrick*, 505 Pa. 530, 542–43, 482 A.2d 215, 221 (1984).

We have been presented with no evidence of undue influence engaged in by the scrivener as to the decedent, nor was there proof of a weakened intellect associated with the testatrix during the period the will in question was prepared. *In re Agostini's Estate*, 311 Pa.Super. 233, 457 A.2d 861 (1983). Accordingly, we are not persuaded to invalidate the will on the grounds that the scrivener acted in violation of the Code of Professional Responsibility. *In re Estate of Pedrick*, *supra*.