Ms. Antonina CANNUNI On Behalf Of
Joseph M. CANNUNI

v.

Richard SCHWEIKER, Secretary of
Health and Human Services.

Appeal of Antonina CANNUNI.

No. 83–5712.

United States Court of Appeals,
Third Circuit.

Submitted under Third Circuit Rule
12(6) June 7, 1984.

Decided Aug. 1, 1984.

Lorraine D. Taylor, Neighborhood Legal Services Ass'n, McKeesport, Pa., for appellant.

J. Alan Johnson, U.S. Atty., Anthony M. Mariani, Asst. U.S. Atty., W.D.Pa., Pittsburgh, Pa., Beverly Dennis, III, Regional Atty., Thomas A. Dougherty, Jr., Asst. Regional Atty., Dept. of Health & Human Services, Philadelphia, Pa., for appellee.

Before WEIS and BECKER, Circuit Judges, and ACKERMAN, District Judge.*

---

* The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The Social Security Administration determined that the addition of a retarded son's name to those of his parents on certificates of deposit and a bank account made him ineligible for continued Supplemental Security Income benefits. As a consequence, the agency demanded repayment of sums previously disbursed. We conclude that under state property law the deposits remained the property of the parents and that the Social Security Administration erred in treating the assets as resources of the son. Accordingly, we will direct entry of judgment denying repayment.

The Secretary determined that an overpayment of SSI benefits had been made to Antonina Cannuni as the representative payee of Joseph Mark Cannuni, her mentally retarded son. Her request for a waiver was denied after a hearing before an ALJ. The Appeals Council denied review. On appeal to the district court, summary judgment was entered in favor of the Secretary.

Joseph Mark Cannuni, often referred to by his parents and in the administrative proceedings as Mark, was awarded SSI benefits in 1976. Although 20 years of age, he was incapable of managing his own affairs, and his mother was designated as his representative payee. Mark had never been employed and had no assets of his own. His father, Domenico, was a self-employed contractor who maintained the home for his wife, Mark, and another younger son who was more severely retarded. Both sons required Antonina's constant care and attention.

At the time they applied for benefits on Mark's behalf, Domenico and Antonina owned several bank accounts. Between 1976 and 1979, apparently on the advice of local bank employees, Antonina put Mark's name along with hers on some bank accounts and certificates of deposit. However, in responding to periodic inquiries from the Social Security Administration

during these same years, Antonina checked boxes on questionnaire forms indicating that Mark had no bank accounts in his name.

In 1979, after learning that Mark's name appeared on accounts at the Mellon bank, the local SSA office concluded he held resources in excess of the statutory allowance. Mark was therefore declared ineligible for benefits from April 1977 until March 1979, when the designation of the accounts was changed. SSA made a demand for overpayment of $3,354.78.

After a hearing, an ALJ concluded that there was an overpayment but that, because of his mental condition, Mark was without fault. Accordingly, as allowed by statute, recovery against him was waived. At the insistence of the local branch manager for SSA, the Secretary continued to press for recovery of the overpayment, this time from Antonina, the representative payee.

In November 1981, a hearing was held before a second ALJ. Because Antonina was ill, she did not attend the hearing. She had, however, submitted letters to the Social Security office, and her husband Domenico testified. The ALJ questioned Domenico about three certificates of deposit totaling $4,000 issued by Mellon Bank during the period in question. Each certificate referred to by the ALJ was titled, "Antonina Cannuni or Domenico Cannuni In Trust For Mark Cannuni."

Domenico testified that the certificates were currently titled in his and his wife's names, and that the couple held bank deposits in excess of $10,000. The ALJ remarked, "Now you understand that for resources that are either Mark's or can be deemed to be Mark's in excess of $1,500, that there is no question about whether or not there's an overpayment." Later, he commented, "[W]e have established ... that the resources in existence at the time Mark was paid ... were in excess of the amount allowed. That means there was an overpayment."

Domenico testified that when he bought the certificates of deposit, the bank manag-er suggested putting money "in savings in trust of Mark [so] that if anything would happen to you in the future Mark would have the money." Domenico also stated that Mark did not have access to the money because of his mental condition and "because the books [were] in the Safety Deposit Box which Mark doesn't have the key for." Domenico said that the money could be taken out for use in his business and had been earned solely by him.

The testimony and documentary evidence from the first hearing were incorporated into the second record. In the first ALJ's decision, the discussion of the evidence includes reference to "a bank account ... maintained in the name of the claimant [Mark] and Antonina Cannuni." The first ALJ also stated, "it was established that the claimant cannot read or write and does not manage his own benefits.... Mrs. Cannuni stated that the account in question was opened by her without knowledge of the claimant and contained her funds— alone. She stated that she was unaware that the listing of the account in her name and the claimant's would affect his eligibility and has since deleted the claimant's name from the account."

Without discussion of the legal issues involved, the second ALJ concluded summarily that there had been an overpayment. After reviewing the evidence, he also found that because Antonina failed to report the saving certificates, she could not qualify for waiver of the overpayment.

Antonina appealed to the Appeals Council in a letter referring to the "the so-called overpayment." She stated that the money in the account belonged to her husband who had died within the previous three weeks, leaving her heavily in debt. She reiterated that Mark had no access to the funds in the bank, and that because she had to care for her two retarded sons, she was unable to seek employment.

The Appeals Council denied review and the Secretary's decision was affirmed by the district court. Mrs. Cannuni appeals, contending that she acted without fault,

and, in any event, the accounts and certificates were not resources of her son.

■ By statute, the Secretary is directed to recover overpayments of SSI benefits. 42 U.S.C. § 1383(b)(1) (Supp. V. 1981). Recovery of the overpayment is waived, however, if the claimant is "without fault in connection with the overpayment," and the "recovery ... would defeat the purpose of this subchapter, or be against equity or good conscience." *Id. See also* 20 C.F.R. §§ 416.550–416.555 (1983). Those provisions extend to representative payees as well. *Evelyn v. Schweiker*, 685 F.2d 351, 352–53 (9th Cir.1982); *see also Abrams v. Schweiker*, 543 F.Supp. 589, 592 (N.D.Ga. 1982) (representative payee liable under 42 U.S.C. § 404(a)).

■ The statute does not designate which party bears the burden of proof to establish the fact of overpayment. We agree with the Court of Appeals for the Eighth Circuit that when the government seeks to recover an alleged overpayment, it must demonstrate that the claimant was not entitled to the Social Security funds. *See United States v. Smith*, 482 F.2d 1120, 1124 (8th Cir.1973); *Burrow v. Finch*, 431 F.2d 486, 491 n. 5 (8th Cir.1970). *Cf. Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984) (right to social security benefits separate from SSA's right to recover overpayment so that "SSA may not recoup previous overpayments from benefits payable after a bankruptcy petition is filed.").

The Secretary's theory is that because Mark Cannuni's name appeared on the bank accounts, they were his resources. However, no matter who bears the burden in this case, the evidence clearly demonstrates that Mark did not have an interest in the bank deposits. Because we conclude that the fact of overpayment has not been established, we need not discuss whether grounds exist to waive the overpayment.

Subchapter XVI of the Social Security Act provides for payments to disabled persons of limited income and resources. *See Nunemaker v. Sec. HEW*, 679 F.2d 328, 330–31 (3d Cir.1982); 42 U.S.C. § 1381 (1976). Individuals without a spouse who have resources (other than those of a specified nature) in excess of $1,500 are not eligible for benefits. 42 U.S.C. § 1382(a)(1)(B). The statute does not define "resources." However, certain items, such as a home, household goods of reasonable value, and a burial plot are excluded from the determination. 42 U.S.C. § 1382b(a). *See Beatty v. Schweiker*, 678 F.2d 359, 360–61 (3d Cir.1982); *see generally* 2 H. McCormick, SOCIAL SECURITY CLAIMS AND PROCEDURES §§ 962–74 (1983).

In the absence of an explicit statutory definition, the Secretary has promulgated regulations explaining the meaning of resources. 20 C.F.R. § 416.1201. The Secretary's authority to issue rules in this context has been questioned. *See Rosenfeld v. Secretary of Health and Human Services*, 563 F.Supp. 1192, 1195 (E.D.N.Y.1983); *cf. Beatty v. Schweiker*, 678 F.2d 359 (3d Cir. 1982). However, we need not pursue that issue here because the agency's regulations do not support the position SSA takes in this case.

The regulation defines resources as "cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his support and maintenance." 20 C.F.R. § 416.1201(a) (1983).[1] The regulation provides that if the individual has the "right, authority or power to liquidate the property, or his share of the property, it is considered a resource." *Id.* Liquid assets are defined as "... cash in savings accounts or checking accounts, stocks, bonds...." *Id.* at § 416.1201(b).

The record in this case is remarkable for its lack of precision and findings on the status of the challenged bank deposits. It

---

**1.** The basic definition of resources contained in 20 C.F.R. § 416.1201 has remained unchanged since its promulgation in 1975.

is understandable that the first ALJ found little reason to delve into the resource question when it was glaringly apparent that the claimant had no part in causing the overpayment.

Apparently the second ALJ felt he could simply accept the conclusion reached in the first hearing on overpayment without examining the evidence in any great detail. As a result, he limited the testimony on this point to the three certificates of deposit. But as to the ownership of these certificates, he obviously erred.

■ The Secretary's regulation refers to resources as property owned by the claimant or that which he has the "right, authority or power to liquidate." The application of that general definition to multiple-party bank accounts is not more specifically explained. Nevertheless, we have little hesitation in holding that in referring to "resources" Congress intended the term to mean property the claimant owns or has the current right to use for his own benefit. After all, it is because of the inability to pay for his own subsistence that the statute grants SSI to eligible claimants. It follows logically that in using the term "resources," the statute refers to property that claimants can apply towards their support. *See Nunemaker v. Sec. HEW*, 679 F.2d 328 (3d Cir.1982) (receipt of housing at less than fair market value constitutes in-kind income); *Beatty v. Schweiker*, 678 F.2d 359 (3d Cir.1982) ($11,500 lump-sum payment of back SSI benefits makes claimant ineligible); *Rosenfeld v. Secretary of Health and Human Services*, 563 F.Supp. at 1196 (Secretary erroneously attributed all funds in joint account to claimant).

■ In the absence of any specific federal standards or principles classifying the bank deposits as resources, it is appropriate to refer to state property law to determine the extent of Mark's interest in the accounts. *See, e.g., Rosenfeld v. Secretary of Health and Human Services*, 563 F.Supp. at 1196. The accounts and certificates were in a Pennsylvania bank and held by Pennsylvania residents. In these circumstances, the law of that state applies.

Chapter 63 of Pennsylvania's Decedents, Estates and Fiduciaries title, sometimes referred to as the Multiple-Party Accounts Act, became effective on September 1, 1976 and governs checking and savings accounts as well as certificates of deposit. 20 PA. CONS.STAT.ANN. § 6301 (1984–85 Supp.). The chapter's provisions are applicable "solely to the determination of property rights among parties to multiple-party accounts." 20 PA.CONS.STAT.ANN. § 6302.

Under section 6303(a), "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion" to their contributions to the sum on deposit, absent "clear and convincing evidence of a different intent." If a trust account is created, it belongs beneficially to the trustee during his lifetime unless a contrary intent appears or an irrevocable trust is created. *Id.* at § 6303(b). On the death of the trustee, the account belongs to the beneficiary. Similarly, on the death of one of the parties to a joint account, ownership vests in the survivors. *Id.* at § 6304.

■ The Act is derived from the Uniform Probate Code. *See* 8 U.L.A., Article VI (1983). The comment to the Code states that the "section reflects the assumption that a person who deposits funds in a multiple-party account normally does not intend to make an irrevocable gift of all or any part of the funds." 8 U.L.A. § 6–103, Comment. *See also* 20 PA.CONS.STAT. ANN. § 6303, Official Advisory Committee Comment—1976. Thus, on the basis of the Pennsylvania statute, the mere creation of a multiple-party savings account or certificate of deposit did not transfer ownership of any part of the funds to Mark.

Under the common law, Pennsylvania courts have held that when both parties have signed a contract creating a joint account with right of survivorship, "there is prima facie evidence of the intent of the party funding the account to make an inter vivos gift to the other joint tenant." *Banko v. Malanecki*, 499 Pa. 92, 96, 451 A.2d 1008, 1010 (1982). If the donee did not sign

the bank signature card, a gift may nevertheless be established through proof of the traditional elements of a donative transfer; namely, intent, delivery, and acceptance. *Estate of Sipe*, 492 Pa. 125, 130, 422 A.2d 826, 827 (1980).

■ Pennsylvania courts have also long recognized "totten trusts," that is, bank accounts in the name of the depositor "in trust for" a beneficiary. These arrangements are presumptively revocable at the will of the depositor. *See Estate of Tippins*, 487 Pa. 107, 111, 408 A.2d 1377, 1379 (1979); *Estate of Agostini*, 311 Pa.Super. 233, ——, 457 A.2d 861, 872–73 (1983). The depositor retains complete control over these funds during his lifetime; ownership vests in the donee only on the depositor-trustee's death. *See Estate of McFetridge*, 472 Pa. 546, 550–51, 372 A.2d 823, 825 (1977); RESTATEMENT (SECOND) OF TRUSTS § 58 (1959).[2]

■ In the matter at hand, the money used to open the accounts and purchase the certificates belonged to Mark's parents, and absent clear and convincing evidence to the contrary, they retained ownership in the sums on deposit. Here, none of the factors recited in the Pennsylvania cases weighing against the parents' ownership have been developed. The uncontroverted evidence is that the parents did not intend a gift *in praesenti* or an irrevocable trust, but wished only to provide for a transfer on survivorship.

There is no suggestion that Mark signed a bank contract, and he never was given possession of a bank book or certificate. Lacking these indicia of ownership, it is doubtful that he would have any power to withdraw the funds had it been shown that he was aware of the existence of the accounts or understood their meaning. That the parents retained full control and ownership over the funds is further demonstrated by their retitling of the accounts and certificates in 1979 to conform to suggestions by the local Social Security office. The Secretary makes no claim that after April 1979 the accounts and certificates were resources of Mark.

The remarks of the ALJ at the second hearing might be an indication that he believed assets owned by the parents could be "deemed" to be those of Mark. If that was the basis for finding that an overpayment had been made, it was clearly erroneous. The administrative file reveals that at the time application was made for Mark's benefits, the "deeming" issue was thoroughly explored and found to have no application.

The record in this case fails to establish that Mark Cannuni at any time owned or controlled all or any part of a bank account or certificates of deposit. The government failed utterly to show that he possessed any resources that would have made him ineligible for SSI.[3] *See also Hanover Bank v. United Penn Bank*, —— Pa.Super. ——, 474 A.2d 1137 (1984).

This case reflects no credit on the Social Security Administration. To subject any citizen to litigation on an unjustified claim over a period of some four years is serious enough. However, when the victim is as heavily burdened as Mrs. Cannuni, whose whole life is dedicated to caring for her two retarded sons, surely someone in the bureaucracy could have taken the time to take a serious look at this case and cry, "basta!" (enough!). *See United States v. Desmond*, 670 F.2d 414, 420 (3d Cir.1982) (Aldisert, J., dissenting).

In the administrative record filed on appeal, not one word is mentioned about

---

**2.** There may have been some question as to the applicability of the totten trust doctrine to certificates of deposit issued before the enactment in 1976 of the Multiple-Party Accounts Act. *Estate of Agostini*, 311 Pa.Super. at —— n. 5, ——, 457 A.2d at 872 n. 5, 873 (1983). That matter is of no relevancy here, however, because the certificates of deposit were issued after the effective date of the statute.

**3.** As one example of the lack of support for the Social Security Administration's position, we note that the Secretary's brief states that in November 1976, Mrs. Cannuni completed a statement of resources indicating that "she and her son had bank accounts with a current value of $8,000." Appellee's Brief at 4. To the contrary, the exhibit sought information only about the parents' resources and the responses referred to accounts in the name of Antonina and her husband.

Pennsylvania property law. The only tangential reference is the statement by a local SSA employee that "[a] parent does not set up an account with a child's name without the bank discussing the factors of what *joint* ownership means." Exhibit B–11. Such a statement hardly qualifies as a legal opinion or as a basis to deny reconsideration. Indeed, the local office might have been enlightened had it bothered to ask the bank employees, even though the SSA could not rely on them for a legal opinion.

Even if Mrs. Cannuni did not have a solid legal defense, as indeed she has, one would have expected this case to have been given special attention instead of being pushed from desk to desk, in indifference to her justified protestations. The government surely has already expended more of the taxpayers' money than the amount being sought from her in this almost mindless pursuit. *Cf. Coker v. Harris,* 508 F.Supp. 996, 1000 (M.D.Ga.1981).

The judgment will be reversed and the matter will be remanded to the district court with instructions to enter judgment in favor of the plaintiff, Mrs. Cannuni.